**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARDA BATES, *et al.*,

        Plaintiffs,

                               Case No. 04-70303

v.                              Hon. Gerald E. Rosen

COLONY PARK ASSOCIATION and
CLAY TOWNSHIP,

        Defendants.

_____/

**OPINION AND ORDER REGARDING DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT AND FOR SANCTIONS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on   September 27, 2005    

PRESENT:  Honorable Gerald E. Rosen
                  United States District Judge

## I.  INTRODUCTION

Plaintiffs, twenty-five property owners in the Colony Park Subdivision in St. Clair

County, Michigan, commenced this suit in this Court on January 28, 2004, asserting a

variety of federal constitutional and state-law claims against Defendants Colony Park

Association and Clay Township.[1]  In support of these claims, Plaintiffs have filed a 32-

_____

[1] Plaintiffs initially named five individuals as co-defendants, but the claims against these individuals were dismissed by stipulated orders entered on April 28 and May 12, 2004.  In addition, two Plaintiffs, Lawrence R. Myers and Judith L. Myers, have asked that they be permitted to withdraw from this litigation, but the notice they filed on August 2, 2004 does not comport with Fed. R. Civ. P. 41(a)(1) (as it lacks Defendants' concurrence), nor have they moved for the dismissal of their claims under Fed. R. Civ. P. 41(a)(2).

page, single-spaced complaint protesting a variety of incidents and actions dating back as far as 1993.  In general, it is evident that Plaintiffs disapprove of a number of decisions purportedly made on their behalf by the Defendant Colony Park Association and its board of trustees, and that, in Plaintiffs' view, Defendant Clay Township was an active participant or "co-conspirator" in many of these challenged actions.

By motions filed on May 6 and August 30, 2004, respectively, the Defendant Township and Association now seek the dismissal of Plaintiffs' claims or, alternatively, an award of summary judgment in their favor.  Among the many grounds advanced in their motions, Defendants principally argue that the vast majority of Plaintiffs' claims are barred by the statute of limitations, and that the remaining claims lack evidentiary support.  Plaintiffs filed a rambling (and untimely) response to the Defendant Township's motion on June 14, 2004, notable for its dearth of citation to pertinent authority or cogent discussion of how the complaint's allegations might support a viable theory of recovery, and also notable for the complete absence of any accompanying exhibits that might provide evidentiary support for Plaintiffs' factual assertions.  Worse yet, Plaintiffs filed ***exactly the same submission*** as their September 2, 2004 response to the Defendant Association's motion,[2] and again failed to attach any supporting exhibits despite ample opportunity to conduct discovery.[3]  Under these circumstances, it should come as no

_____

[2]Indeed, this response was captioned as a response to the Defendant Township's motion, to which Plaintiffs already had responded several weeks earlier.

[3]Moreover, the Court's deadline for the exchange of witness lists came and went without Plaintiffs producing any such lists.  Accordingly, when Plaintiffs finally served a witness list

surprise that, by motions filed on May 28 and August 30, 2004, Defendants also seek the

imposition of sanctions under Fed. R. Civ. P. 11.[4]

Having reviewed the parties' written submissions and the record as a whole, the

Court finds that the operative facts and allegations and the relevant legal issues are

adequately presented in these materials, and that oral argument would not assist in the

resolution of Defendants' motions.  Accordingly, the Court will decide these motions "on

the briefs."  See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.

This Opinion and Order sets forth the Court's rulings.

## II.  FACTUAL BACKGROUND

As noted, Plaintiffs' complaint provides little guidance as to the precise nature and

scope of the claims advanced in this case, and Plaintiffs' more recent submissions provide

no further assistance on this score.  Nonetheless, Defendants read Plaintiffs' complaint as

concerned chiefly with three matters — the water system serving Plaintiffs' property, the

mid-1990's replacement of the bridges that facilitate access to the Colony Park

Subdivision, and the "Colony Tower," a historic landmark located in the subdivision —

and Plaintiffs have not challenged this understanding in their responses to Defendants'

motions.  Accordingly, the Court will focus on these three matters in recounting the

---

several weeks past the Court's deadline, Defendants lodged objections asserting that Plaintiffs
should be barred from calling any witnesses at trial.  More generally, Defendants observe that
Plaintiffs have failed to initiate any discovery whatsoever during this litigation.

[4]Predictably, Plaintiffs' response to these motions was a near-verbatim repeat of their
earlier submissions.

pertinent factual background of this case.

First, however, it is helpful to review the general background of the Colony Park Subdivision in St. Clair County, Michigan. This subdivision was platted in 1927, and originally was an exclusive, gated community that contained only a few homes. This community initially was served by a private system of water drawn directly from the St. Clair River. Today, the subdivision contains about 135 homes, and the 25 Plaintiffs in this case own 16 of these homes. Defendant Clay Township has been furnishing water to this development since 1978, but, as discussed below, the parties dispute whether ownership of the water system itself vested in the Township at some point thereafter.

Defendant Colony Park Association ("CPA") was incorporated in 1945 under Michigan's Summer Resort Owners Act, Mich. Comp. Laws § 455.201 *et seq.*[5] CPA's articles of incorporation provide that the purpose of this corporation is "[t]o better the welfare of the community; to buy, improve, sell, convey, mortgage and lease lands; to obtain lands by gift or otherwise; to exercise certain police powers within said community, etc., and to maintain and enforce restrictions upon property" within the subdivision. (Township's Motion, Ex. 1-B, Articles of Incorporation art. IV.) CPA's bylaws echo this language. (See Township's Motion, Ex. 1-E, Bylaws art. II, § 4.)

Under CPA's bylaws, the association is governed by a nine-member board of

_____

[5]Under this Act, a properly formed summer resort owners corporation "possess[es] all the general powers and privileges and [is] subject to all the liabilities of a municipal corporation," and serves as "the local governing body" for the resort development. Mich. Comp. Laws § 455.204.

4

trustees, which in turn is responsible for electing the association's officers.  These

officers, under the direction of the board of trustees, are generally charged with the duties

"to diligently maintain the general character of the Colony Park Subdivision, . . . to

preserve the original restrictions [established upon the original recording of the

subdivision], to promote the general welfare of the owners; [and] to make provisions for

the maintenance of the bridges, roads, water supply, fire protection, and all other

necessary requirements for the general welfare of the owners of property in Colony

Subdivision."  (Id., art. VII, § 26.

## A.     The Subdivision's Water System

As noted, many of the complaint's allegations concern the Colony Park

Subdivision's water system.  In 1950, the private developer that built this system

conveyed it to the CPA, along with "[a]ll pipes, fittings, installations and appurtenances

used in connection with the water system."  (Township's Motion, Ex. 2-A.)  In the

Defendant Township's view, the ownership of this water system has remained with the

CPA ever since.

In 1978, the Township entered into an agreement with the Colony Park Water

Company ("CPWC") to supply water to the Colony Park Subdivision.  The preamble to

this agreement recites:  (i) that CPWC was incorporated in 1958 "for the purpose of

obtaining and furnishing water to the members of the Colony Park Association;" (ii) that

the Michigan Department of Public Health had determined that the subdivision's current

water system was "inadequate," and had threatened to take legal action "unless

5

satisfactory water supply is furnished to members of the Colony Park Association forthwith;" and (iii) that the Defendant Township was "able and authorized to supply the C.P.W.C. by sale of water to said Company and the C.P.W.C. is authorized to purchase water from the Township." (Township's Motion, Ex. 2-B, Water and Maintenance Agreement at 1.)

Several provisions of this 1978 agreement are relevant to the present litigation. Generally, the Township agreed to sell and deliver to the CPWC "such quantity of water of and from the water system of the Township as shall serve all the requirements of" the CPWC. (Id. at 2.) The Township further agreed to maintain and read all of the master and individual meters in the CPWC water system, and to bill the subdivision residents on a quarterly basis in accordance with the usual ordinances governing water distribution in the Township. The CPWC, in turn, agreed to install a master meter, and to arrange for the installation of individual water meters for each member of the CPA.[6]

The 1978 agreement further provided for the establishment of a "repair and maintenance fund," to be instituted by the CPWC and funded through $3.00 quarterly charges added to the Township's water bills for each subdivision resident. (Id.) This fund was capped at $10,000, with further collections to cease when the fund reached this limit.[7] Finally, the agreement provided that the subdivision's "water distribution system

---

[6]These individual meters were to be installed through a contract with the Township, at a cost of $650.00 per unit.

[7]The provisions of the 1978 agreement relating to the "repair and maintenance fund" were amended in 1981 to reflect the parties' intention that this fund should be used to defray

shall remain in the property of C.P.W.C.," with the Township agreeing to repair and maintain this water system as contracted and paid for by the CPWC.  (Id. at 3.)[8]

This agreement did not solve the problems with the Colony Park Subdivision's water system.  In 1992, for example, the CPA retained a consulting engineering firm, Hubbell, Roth & Clark, Inc., to study the water system and recommend various alternatives for improving it.  Among the concerns noted in the resulting report, the consulting firm observed that the water pressure in the system had been deliberately limited to 35 psi, versus the water pressure of 55 psi at the Township's point of delivery, in order to "minimize leaks associated with old systems."  (Township's Motion, Ex. 2-E, April 1992 Water System Improvements Report at 1.)  The report further noted that, while several improvements had been made to the system in 1966, the original 1927 water main running from the system's master meter had not been replaced.  Although the consulting firm proposed several alternatives for improving the subdivision's water system, none of these were implemented at the time, apparently due to lack of funds.

Similarly, in 1994, a Michigan Department of Public Health official wrote to the Township and the CPA, noting that "[t]he condition of the private water distribution

---

certain operational as well as repair and maintenance costs.  The 1981 amendments preserved the fund limit of $10,000, but removed the language setting the collection amount at $3.00 per quarter.

[8]Shortly after the execution of this agreement, the City of Algonac passed a resolution approving the Township's request that the Colony Park Subdivision be connected to the municipal water system.  As a result, the subdivision no longer drew its water directly from the St. Clair River, but instead received its water from the municipal system.

7

system that serves the Colony Association has been an item of concern for some time."

(Township's Motion, Ex. 2-F, 4/4/1994 Letter at 1.)  This letter again observed that "[a]

pressure reducing valve (PRV) was installed on the main feed line to cut back the normal

system pressure to prevent main breaks and excessive leakage."  (Id.)  The state health

official expressed concern that, "[w]hile the PRV may allow these deteriorated water

lines to remain in operation, it can also result in unsatisfactory pressures for normal

service," and that "low system pressure can have public health impacts if the pressure

drops below acceptable minimums."  (Id.)  This letter then states:

> It is evident that the water mains that serve the Colony Association are inadequate, and have in large part, reached their design life and are in need of replacement.  If the pressure data demonstrates a more severe problem than previously thought, a plan and a schedule to upgrade the entire system will be required.  A critical part of this plan would be to dedicate the replacement mains to the township, and get the association out of the water business.

(Id. at 2.)  Despite these concerns, and despite one or more petition drives among the

CPA membership to fund improvements to the water system,[9] no action was taken at this

time.

Rather, when an improvement effort finally went forward in 1995, it apparently

was driven by the necessity of replacing water mains that appeared unlikely to survive the

---

[9]According to the complaint, a proposal to create a "Water Special Assessment District" was tabled in August of 1993 when it received the approval of only 43 percent of the CPA membership.  (Complaint at ¶ 16.)

8

process of replacing the bridges that permit access to the Colony Park Subdivision.[10]  As
stated in a March 1995 bulletin from the CPA board of trustees to property owners,
"[s]everal professionals have given us their input on the status of the water mains and the
likelihood that a rupture or break would occur during the bridge replacement."
(Township's Motion, Ex. 1-M, March 1995 Bulletin.)  Thus, in order to "insure continued
delivery of safe water to each property owner," the board announced that it had entered
into a revised water maintenance and repair agreement with the Township, and that a one-
time special assessment of $495.00 would be added to each property owner's April 1995
Township water bill.  (Id.)  The board stated that it was taking these actions pursuant to
the CPA membership's approval at a March 11, 1995 "special general membership
meeting" of a motion authorizing the collection of a one-time assessment from each
property owner to cover the estimated $80,000 cost of replacing the water mains that ran
near the bridges.  (Id.; see also Township's Motion, Ex. 1-N, Minutes of 3/11/1995
Special Meeting of CPA Membership.)

    As noted in the March 1995 bulletin, the CPA and the Township entered into a
February 6, 1995 "Water, Maintenance and Replacement Agreement" that was similar in
many respects to the 1978 agreement between the Township and the CPWC.  In
particular, the Township promised, as it had in the earlier agreement, to "provide, supply,
sell, and deliver to the C.P.A. such quantity of water from the water system of the

---

[10]This bridge replacement project is discussed in greater detail below, as it forms the
basis for some of the claims advanced in Plaintiffs' complaint.

Township as shall service all the requirements of the C.P.A."  (Township's Motion, Ex. 2-I, 2/6/1995 Agreement at 1.)  The terms of the earlier agreement were modified in one significant respect, however, through the establishment of a "C.P.A. Water Repair, Maintenance, Operation and Replacement Fund" that was capped at $500,000 (as opposed to the prior $10,000 limit).  (Id. at 2.)  The proceeds of this fund were to be collected from CPA residents through fees added to their quarterly water bills, "at a rate to be determined from time to time by motion or resolution of the Colony Park Association."  (Id.)[11]  Finally, the 1995 agreement stated that "[t]he C.P.A. water distribution system shall remain the property of the C.P.A.," with the Township agreeing to repair and maintain the system as contracted and paid for by the CPA.  (Id.)

In their complaint, Plaintiffs apparently advance a number of challenges relating to the subdivision's water system and the assessments included in their water bills.  First, Plaintiffs seemingly allege that neither the one-time $495 assessment nor the terms of the February 1995 agreement with the Township (and the resulting $30 quarterly assessment) were properly approved by the CPA membership.  Plaintiffs further challenge the authority of the CPA board of trustees to dictate the manner in which the Township should impose these one-time and quarterly assessments on the property owners — i.e., as flat amounts per property owner, versus assessments calculated per running foot of

_____

[11]In its March 1995 bulletin to property owners, the CPA board of trustees stated that this fee would initially be $30 per quarter, and the CPA membership also was advised of this amount at the March 11, 1995 special meeting.

10

property at the road.  Next, to the extent that the CPA board claims to have secured the approval of these actions at membership meetings, Plaintiffs allege that any such approval was obtained through misrepresentation and duress.

Finally, Plaintiffs challenge various aspects of the Township's involvement with the subdivision's water system and the corresponding assessments.  Plaintiffs apparently allege, for example, that the Township fraudulently disavowed or otherwise misrepresented its role in the imposition of these assessments.  Plaintiffs also allege that the Township assumed ownership of the subdivision's water system upon the dissolution of the CPWC in 1988,[12] but that the Township fraudulently disclaimed this ownership in the 1995 water agreement with the CPA.[13]

---

[12]In the Township's view, the subdivision's water system has remained the property of the CPA at all times since the system was conveyed to the association in 1950 by its original developer.  Although the 1978 water agreement stated that the CPWC owned the system, the Township points to the lack of any evidence that the CPA ever conveyed the system to the CPWC (or any other entity, for that matter).  In addition, the Township notes that the record is replete with acknowledgments of the CPA's continued ownership of the water system.

In positing a transfer of ownership to the Township, Plaintiffs begin by pointing to the language of the 1978 agreement stating that the water system was owned at that time by the CPWC.  Plaintiffs further allege that, prior to the 1978 agreement, the CPWC issued quarterly water bills to the subdivision's residents.  By the terms of this agreement, of course, the Township assumed this billing function as of 1978.  In Plaintiffs' view, when the CPWC ceased its existence in 1988, the 1978 agreement lapsed due to the loss of one of the contracting parties, and ownership of the water system somehow transferred to the Township by virtue of its continued delivery of water to the subdivision and its continued billing of the subdivision's residents.  Plaintiffs, however, have failed to identify any legal theory under which such a transfer could have occurred without any record of an actual conveyance, formal or otherwise.

[13]Plaintiffs have not endeavored to explain why the Township might have wanted to disavow any alleged ownership interest in the water system, or what sort of injury might have flowed from the Township's alleged disavowal of this interest.

**B.      The Bridge Replacement Project**

The Colony Park Subdivision runs along Colony Drive, which includes three bridges along its length that span canals running to the St. Clair River. The original bridges apparently were built in the early 1900s, and the CPA eventually determined that they should be replaced.[14] Accordingly, in August of 1993, the CPA filed a petition with the Township, supported by the signatures of the requisite number of property owners, seeking the establishment of a special assessment district ("SAD") for the reconstruction of the bridges. An engineering firm retained by the CPA, Elten Engineering, initially estimated the cost of this project as $500,000.

From the fall of 1993 through the spring of 1994, the Township board held various meetings and conducted several public hearings on the petition for an SAD. One issue that arose during these meetings and hearings was the method of assessment, with some property owners advocating that assessments should be calculated per running foot of property along the road rather than per lot. The Township board ultimately adopted this view in a resolution passed on May 6, 1994, which called for the collection of a special assessment in seven equal annual installments beginning on July 31, 1994.

Formal bidding then began on the project, but even the lowest bid exceeded the initial estimated cost of $500,000 by over $30,000. Accordingly, the CPA board

---

[14]Defendants state, for example, that garbage trucks eventually refused to pass over the bridges, meaning that the subdivision residents had to haul their own trash up to the main road for pickup. In addition, the first bridge in the sequence was weight-restricted, so that heavy delivery trucks, fire and emergency vehicles, and school buses could not use it.

12

requested that the Township conduct an additional public hearing and adopt a revised resolution increasing the special assessment amount to $650,000. In a newsletter to the subdivision's property owners, the CPA board apparently explained that this increased amount was necessary to account for bids above the initial $500,000 estimate, additional engineering costs, an unexpected commission fee, the cost of moving utilities during the reconstruction project, and any other unforeseen problems such as water line breaks.[15] The Township board passed a revised resolution reflecting this increase, and scheduling a public hearing in October of 1994. Following this hearing, the Township board adopted a resolution calling for the collection of a $650,000 special assessment in ten equal annual installments beginning on November 4, 1994.

The CPA ultimately rejected two lower bids as inadequate in certain respects, and recommended that the project be awarded to Borbolla Construction at a cost of $562,059.91. The Township board accepted this recommendation, and awarded the project to Borbolla through a resolution passed on December 6, 1994. At around the same time, the CPA and the Township entered into an indemnity agreement, under which the CPA agreed to indemnify the Township and hold it harmless for any costs or cost overruns arising from the bridge reconstruction project, as well as any claims by CPA members or contractors relating to this project. As grounds for this indemnification, the

---

[15]In their complaint, Plaintiffs allege that the CPA board knew or should have known that even this increased special assessment amount of $650,000 was inadequate, where the low bid for the bridge reconstruction project was over $530,000 and the newsletter identified additional costs of nearly $160,000, resulting in a total of almost $700,000.

agreement recited that the bridges were privately owned and maintained by the CPA, and that the Township had agreed to assist the CPA in replacing the bridges by obtaining bond financing and collecting funds from CPA residents through special assessments.

Again, Plaintiffs' submissions are far from clear as to which aspects of this bridge reconstruction project they mean to challenge, and on what grounds. Their primary complaints appear to be that the CPA board, and perhaps also the Township, knew or should have known that the special assessment amount of $650,000 would be inadequate to complete the project,[16] and that the CPA board improperly agreed to indemnify the Township in connection with this project. As for the grounds under which this conduct allegedly could be deemed unlawful, Plaintiffs cite repeatedly to a Michigan statute which requires that any improvements made with the approval of a township board must include as part of their cost "[t]he cost of engineering services and all expenses incident to the proceedings for the making and financing of the improvement." Mich. Comp. Laws § 41.721. Plaintiffs apparently claim that the $650,000 amount approved by the Township board failed to account for all of these costs.

## C.    The Sale and Planned Restoration of the Colony Tower

The Colony Tower is located along highway M-29 at the entrance to the Colony Park subdivision. The Tower initially served as a water tower, but this use was

---

[16]As a matter of brute fact, the complaint is devoid of allegations, and the record likewise is devoid of evidence, that the cost of the completed project actually exceeded $650,000, or that Plaintiffs ever were called upon to pay any such cost overruns.

14

discontinued when the subdivision's private water system was connected to the adjacent municipal water lines.  Nonetheless, the Tower has remained in place, and has been designated as a state historic structure by the State of Michigan's Historic Preservation Office.

The Tower fell into disrepair over the years, and the CPA launched an effort to raise funds for its rehabilitation through fundraising activities and individual contributions.  This effort apparently raised about $60,000 over approximately a 10-year period, with roughly $40,000 of this amount evidently devoted to structural repairs.  A 2001 engineering study indicated ,however, that it would cost approximately $400,000 to completely restore the Tower.  In light of this substantial shortfall in available funds, the CPA board began to explore other options for rehabilitating the Tower.

In one such effort, the CPA board sent a letter to the Township on April 30, 2002, proposing that the Township purchase the Tower for $1.00 and assume responsibility for its restoration.  This proposal rested primarily upon the theory that the Township, unlike the CPA, might be able to secure grant money to fund the restoration effort.  In this letter, the CPA board observed that the Tower would likely be demolished unless the Township or another entity agreed to purchase it.

On May 27, 2002, the CPA board conducted an advisory survey of Colony Park property owners to elicit their views about the disposition of the Tower.  In an accompanying letter, the board stated its view that it retained the right and responsibility to make decisions concerning the disposition of the Tower as common CPA property, so

that the board would not be bound by the results of the survey of property owners.

Nonetheless, the owners were asked to state their views as to three proposals: (i)

restoration of the Tower through a combination of approximately $70,000 in currently

available funds[17] plus approximately $330,000 in borrowed funds, to be financed, at least

in part, through rental income received from Sprint and other vendors who used or might

subsequently pay to use the property; (ii) sale of the Tower to the Township for $1.00,

with the stipulation that the Township assume all costs of restoration and future

maintenance; or (iii) demolition of the Tower, at a cost of approximately $26,500.  The

record indicates that the property owners voted (i) 14 to 66 against the CPA undertaking

its own restoration effort, (ii) 78 to 8 in favor of selling the Tower to the Township, and

(iii) 37 to 42 against the demolition of the Tower.[18]

On September 26, 2002, the Township's Zoning Board of Appeals ("ZBA") held a

public meeting to address a lot split sought by the CPA in connection with the sale of the

Tower.  As stated by CPA board president Paul Johnson in a July 20, 2002 letter to CPA

property owners, the purpose of this lot split was to ensure that the CPA retained

ownership and control of a 22-foot sliver of waterfront property adjacent to the Tower, so

that the Township could not make this land available to the general public as a boat ramp

---

[17]This figure apparently included a remaining balance of approximately $20,000 that had been collected through volunteer fundraising efforts, plus $20,000 collected from Ameritech under an antenna lease and $30,000 held in a CPA special account.

[18]The record further indicates, and Plaintiffs do not dispute, that nine of the named Plaintiffs voted in favor of the proposal to sell the Tower to the Township.

or for any other public use, and so that no freestanding cell tower could be built on this strip of land.  In addition, under the proposed lot split, the CPA retained easements for access to a master water meter and phone substation.  The ZBA approved the lot split, with no member of the public speaking in opposition.

Next, on October 7, 2002, the Township board voted to approve the agreement to purchase the Tower from the CPA for $1.00.  Under this agreement, the Township obtained the Tower itself, all but the above-cited 22-foot sliver of the lot upon which the Tower stood, and easements over an adjacent lot for the purpose of maintaining and restoring the Tower.  In turn, the Township agreed to restore the Tower in accordance with all applicable state and federal laws and guidelines regarding historic structures, and to preserve the phrase, "The Colony," on the Tower at its present size and location.  In addition, the agreement included a right of reversion, under which the Township, if it elected not to restore the Tower, would reconvey the property to the CPA for $1.00 after first having, at the CPA's option and at the Township's expense, destroyed the Tower and removed all of the demolished materials.[19]

Once again, Plaintiffs' complaint and subsequent submissions are anything but clear as to the nature and legal basis of their challenges to the sale of the Colony Tower.  They apparently assert that the CPA lacked the authority to transfer the Tower and land to the Township absent a proper vote of the CPA membership, and that the survey

_____

[19]It appears from the record, however, that the Township has proceeded in the effort to restore the Colony Tower, and that this restoration project has been completed.

17

conducted by the CPA board in the summer of 2002 did not qualify as such a vote. Plaintiffs also question whether the CPA has properly accounted for all of the funds collected from CPA property owners for the purpose of restoring and maintaining the Tower. Finally, Plaintiffs appear, somewhat curiously, to challenge the CPA's retention of a 22-foot portion of the lot on which the Tower sits, apparently contending that the CPA property owners did not give the necessary approval for this lot split, and suggesting that the CPA board pursued this course of action for the improper purposes of ensuring its own continued existence and retaining power over a parcel of waterfront property.

### III.  ANALYSIS

**A.**    **The Standards Governing Defendants' Summary Judgment Motions**

Through their present motions, Defendants seek either the dismissal of this suit or summary judgment in their favor. Because the Court has consulted materials outside the pleadings, it will treat these motions as requesting summary judgment. See Fed. R. Civ. P. 12(b). Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986) — ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered

18

the movant's burden in seeking summary judgment.[20]  As stated in <u>Celotex</u>:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

<u>Celotex</u>, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles

governing motions for summary judgment.  These principles include:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

---

[20]"[T]aken together, these three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."  10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, <u>Federal Practice & Procedure</u>, § 2727, at 468 (1998) (footnote omitted).

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989).  See also

Nernberg v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994).  The Court will apply these

standards in resolving Defendants' motions.

**B.    Plaintiffs' Claims Concerning the Colony Park Water System and Bridges Are Time-Barred Under the Governing Three-Year Statute of Limitations.**

As the foregoing factual recitation makes clear, Plaintiffs' complaints regarding

the Colony Park water system and bridge replacement project concern events that

occurred and actions that were taken back in the mid 1990s.  In seeking summary

judgment in their favor on these claims, Defendants argue that Plaintiffs failed to timely

commence these challenges within the three-year period dictated by the applicable statute

of limitations.  The Court readily agrees.

Michigan law establishes a three-year statute of limitations for most claims of

injury to a person or property.  See Mich. Comp. Laws § 600.5805(10).  This same three-

year period of limitation governs federal constitutional claims under 42 U.S.C. § 1983

that arise in the State of Michigan.  See Wilson v. Garcia, 471 U.S. 261, 276-80, 105 S.

Ct. 1938, 1947-49 (1985); McCune v. City of Grand Rapids, 842 F.2d 903, 905 (6th Cir.

1988).  In this case, then, Plaintiffs' federal constitutional claims relating to the Colony

Park water system — and, specifically, their challenges to certain assessments included in

their water bills — are governed by Michigan's three-year statute of limitations, and the

same is also true as to Plaintiffs' § 1983 claims concerning the replacement of the Colony

Drive bridges.  Moreover, this same three-year period of limitation applies to Plaintiffs'

20

state-law theories of recovery, which apparently consist of claims of civil conspiracy and fraud.

It readily follows that Plaintiffs' claims regarding the water system and bridge replacement are time-barred.  As noted by Defendants, the most recent of the water system agreements cited in Plaintiffs' complaint is the February 6, 1995 "Water, Maintenance and Replacement Agreement" executed by the Township and the CPWC. This agreement resulted in the one-time $495 assessment and quarterly $30 assessments that Plaintiffs evidently mean to challenge in this action, and Defendants state without contradiction that these assessments appeared on Plaintiffs' spring 1995 water bills.  Yet, Plaintiffs commenced this action in January of 2004, nearly nine years after suffering the injuries of which they now complain, and almost nine years after Defendants took the most recent of the actions that Plaintiffs now wish to challenge.  There would seem to be no doubt, then, that Plaintiffs' claims relating to the Colony Park water system and corresponding assessments are time-barred.

Likewise, Plaintiffs' claims regarding the Colony Drive bridge replacement project would certainly appear to be time-barred.  Again, all of the pertinent resolutions, contracts, and the like were in existence by late 1994 or early 1995.  The special assessment district was established in October of 1994, and the first of the annual installments of this assessment was imposed and collected in November of that year. Finally, Defendants state without dispute that the project was promptly commenced and completed, with the contractor long ago having been paid for its work.  Any suit arising

21

from this project, therefore, presumptively should have been commenced in late 1997 or early 1998 at the latest, long before this action was filed in January of 2004.

Plaintiffs' response on this point, to the extent that the Court is able to glean any,[21] is that they only "recently discovered" Defendants' alleged wrongdoing, and that the three-year period of limitation is overcome by the "continuing" nature of Defendants' alleged violations. As to the first of these contentions, the Court observes that the allegations of Plaintiffs' complaint rest almost exclusively on matters of public record, such as written agreements executed by one or both Defendants, decisions reached at public Township or CPA board meetings as recorded in their minutes, and the like. Moreover, Plaintiffs can hardly claim to have "recently discovered" assessments that were first imposed upon them nearly a decade ago. Indeed, some of the Plaintiffs, at least, clearly were aware several years ago of many of the events and actions they now

_____

[21]Most of what Plaintiffs and their counsel have to say on this subject is simply incomprehensible:

> Plaintiffs are not barred by the statute of limitations because pertaining to death or injury and other actions regarding such, statute of limitations applies only to claims asserted under State law, and some claims set forth under the United States Constitution and 42 USCA 1983, but the case at bar is one of continuing irreparable harm.[] Defendants cite the following case <u>Wilson v Garcia, 471 US261;85L ED 2d 254; 105S Ct 1938 (1985),</u> the Unite States Supreme Court was called upon to interpret the statute of limitations relative to Sec 1983 claim. Again, Defendants have cited appropriate and valid case law, although Defendants fail to assert the fact that this pertains to personal injury in <u>Wilson v. Garcia.</u>  The case at bar is one of Constitutional basis and not pertaining to an economic harm or loss.

(Plaintiffs' Response to Defendant CPA's Motion at ___ (pages not numbered).)

seek to challenge, as they were parties to state court proceedings in which they questioned

the CPA's authority to impose certain of the very same assessments at issue here.[22]

More generally, Plaintiffs have utterly failed to identify any sort of "recent

discovery" that supplied the knowledge necessary to pursue the claims advanced in their

complaint, much less endeavored to show why any such information was not readily

obtainable long ago. See McCune, 842 F.2d at 905 (observing that "the statute of

limitations begins to run when the plaintiff knows or has reason to know of the injury

which is the basis of his action," and that "a plaintiff has reason to know of his injury

when he should have discovered it through the exercise of reasonable diligence").  Surely,

the imposition of the challenged assessments back in 1994 and early 1995 triggered, at a

minimum, Plaintiffs' obligation to inquire into the basis for and lawfulness of these

assessments.  Accordingly, the Court finds no basis for tolling, much less by a period of

several years, the ordinary running of the applicable three-year period of limitation.

Neither have Plaintiffs identified any basis for invoking a "continuing violation"

---

[22]Specifically, Plaintiffs Gerald Tilly and Richard Quandt were named as defendants in a
state court suit in which the CPA sought to collect the one-time and quarterly assessments for the
Colony Park water system.  It appears from the record that they challenged the CPA's authority
to impose these assessments, but that the state court ruled against them on this point.  In addition,
Plaintiffs James and Marda Bates brought a state court suit against the CPA in February of 2002,
claiming that the CPA had exceeded its authority in imposing annual property assessments
(including, to some extent, the water system assessments at issue here) over the past several
years.  The state court entered a judgment in favor of the CPA and against Mr. and Ms. Bates.

As Defendants point out in their motions, these prior state court actions might well have a
claim-preclusive effect here, at least as to the Plaintiffs who were parties to the suits and the
claims that were or could have been raised in the state court proceedings.  Because the Court is
resolving Plaintiffs' claims on other grounds, however, it need not address this issue here.

theory to extend this statutory three-year period.  Most significantly, Plaintiffs have

offered only the bare assertion that Defendants' alleged wrongdoing is "ongoing,"

without any evidentiary support or even so much as a suggestion as to what this

"ongoing" conduct might be.  To be sure, the periodic assessments for the water system

and the bridge replacement have extended beyond their initial imposition in 1994 and

1995, with one or both presumably still in existence at the time this suit was commenced.

Yet, the courts have uniformly held that the "continuing violation" theory is available

only in cases where a defendant engages in continued *wrongdoing* that extends into the

limitation period, and not where a defendant's wrongdoing merely results in continuing *ill*

*effects* that extend into the limitation period.  See, e.g., Trzebuckowski v. City of

Cleveland, 319 F.3d 853, 858 (6th Cir. 2003); McCune, 842 F.2d at 905-06; Cowell v.

Palmer Township, 263 F.3d 286, 293 (3d Cir. 2001); Gilbert v. City of Cambridge, 932

F.2d 51, 58-59 (1st Cir. 1991).  Here, any alleged wrongdoing occurred in 1994 and 1995,

and the mere fact that these actions might have continuing effects does not suffice to toll

the three-year statute of limitations.  Accordingly, Plaintiffs' claims regarding the Colony

Park water system and bridge replacement project are time-barred.[23]

---

[23]In addition, while Defendants have not raised the issue in their motions, the Court notes
another legal defect in Plaintiffs' § 1983 claims relating to the water system and bridge
assessments.  Citing principles of comity, the Supreme Court has held that a taxpayer may not
bring a § 1983 suit in federal court challenging the validity of a state or local tax, so long as the
state affords the taxpayer a remedy which is "plain, adequate, and complete."  Fair Assessment
in Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100, 116, 102 S. Ct. 177, 186 (1981); see also
Chippewa Trading Co. v. Cox, 365 F.3d 538, 541-44 (6th Cir. 2004); Tomaiolo v. Mallinoff, 281
F.3d 1, 5-8 (1st Cir. 2002); Lawyer v. Hilton Head Public Service Dist. No. 1, 220 F.3d 298,
302-06 (4th Cir. 2000).  Here, there is no doubt as to the availability of a state remedy — as

**C.     Defendants Are Entitled to Summary Judgment in Their Favor on Plaintiffs' Claims Concerning the Colony Tower.**

Plaintiffs' remaining claims, so far as can be discerned from their complaint and subsequent submissions, concern the circumstances surrounding the sale of the Colony Tower to the Township.  In their present motions, Defendants advance a number of grounds for summary judgment in their favor on these claims, including (i) governmental immunity as to any state-law tort claims, and (ii) failure to produce any evidence in support of a viable federal constitutional claim under 42 U.S.C. § 1983.  The Court agrees as to both of these contentions, and thus need not decide whether Plaintiffs' claims might also be defective in other respects.

As noted in Defendants' motions, Michigan law shields governmental agencies from tort liability so long as the agency "is engaged in the exercise or discharge of a governmental function."  Mich. Comp. Laws § 691.1407(1).  The Michigan Supreme Court has instructed that the term "governmental function" should be "interpreted in a

_____

noted earlier, at least two of the named Plaintiffs already sought such relief in state court, albeit without success.  Thus, § 1983 does not provide a vehicle for Plaintiffs to challenge the legality of the tax assessments relating to the Colony Park water system and bridge replacement.

From this result, it readily follows that the Court cannot entertain Defendant CPA's counterclaims against various of the Plaintiffs for recovery of overdue assessments.  In order to adjudicate any possible defenses to these counterclaims, the Court would have to address tax validity issues that are properly presented to state agencies or tribunals — as, indeed, the CPA itself and some of the Plaintiffs have done in the past.  In addition, the CPA would not be entitled to the default judgment sought in its September 1, 2004 motion, because it has not yet sought a clerk's entry of default under Fed. R. Civ. P. 55(a).  Accordingly, the Court denies the CPA's September 1 motion, and dismisses its counterclaims without prejudice, so that it can pursue these claims in an appropriate state forum if it so chooses.

25

broad manner," and encompasses any "activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." Ross v. Consumers Power Co., 420 Mich. 567, 363 N.W.2d 641, 660-61 (1984). It is clear that the Defendant Township is within the ambit of the governmental immunity statute. See, e.g., Randall v. Delta Charter Township, 121 Mich. App. 26, 328 N.W.2d 562, 563-65 (1982). In addition, the Defendant CPA contends, and Plaintiffs do not dispute, that it qualifies as a governmental agency under the immunity statute, by virtue of the provision in Michigan's Summer Resort Owners Act stating that an association formed under the Act "shall have and possess all the general powers and privileges and be subject to all the liabilities of a municipal corporation." Mich. Comp. Laws § 455.204.

It readily follows that Defendants are entitled to immunity from liability under any state-law tort theory Plaintiffs might have advanced in their complaint. The Township undoubtedly is authorized to buy land, particularly in an effort to preserve a designated historic landmark in the community. In addition, it is clear that the Township's Zoning Board of Appeals was performing a governmental function when it conducted a public hearing and approved a lot split in connection with the sale of the Tower. Finally, the CPA, through its board of trustees, possesses the general authority to "manage[] and control . . . all the property, real and personal," held by the association, Mich. Comp. Laws § 455.210, and Plaintiffs' allegation that the CPA misused this authority does not in any way detract from the "governmental" nature of the association's activities, see Richardson v. Jackson County, 432 Mich. 377, 443 N.W.2d 105, 108-09 (1989).

Accordingly, Defendants are entitled to summary judgment in their favor on Plaintiffs' state-law tort claims relating to the sale of the Colony Tower.

This leaves only Plaintiffs' federal claim under 42 U.S.C. § 1983 that the circumstances surrounding the sale of the Tower somehow abridged their rights under the U.S. Constitution. While their complaint is characteristically vague and muddled as to the precise nature of this claim, Plaintiffs apparently allege that Defendants violated their Fourteenth Amendment due process rights by carrying out the sale and purchase of the Tower and corresponding land without affording them the opportunity to vote on this property transfer.

Regardless of whether Plaintiffs might have stated a viable federal due process claim in their complaint, the Court readily concludes that they cannot sustain such a claim under the present record. Plaintiffs' claim of a due process violation rests upon their reading of a provision of Michigan's Summer Resort Owners Act stating:

> The trustees of such corporation [*i.e.,* an association incorporated under the Act], when thereunto authorized, by majority vote of the members of such corporation voting thereon at any annual meeting, or any special meeting called expressly for that purpose, by a general by-law, adopted and recorded, may sell, mortgage, give, grant, convey and lease said lands or any part or portion thereof, upon such terms and subject to such reservations and restrictions as may be deemed advisable.

Mich. Comp. Laws § 455.205. In Plaintiffs' view, this statute required the CPA to secure the approval of a majority of its membership before selling the Colony Tower to the Township. Plaintiffs further assert that the membership survey conducted by the CPA before proceeding with the sale did not satisfy the statutory prerequisite of a "majority

27

vote of the members." From this, Plaintiffs surmise that their due process rights were violated.

This contention, however, is flawed in several respects. Leaving aside Plaintiffs' debatable reading of the admittedly obscure language of § 455.205,[24] Plaintiffs apparently are proceeding under the erroneous assumption that a violation of the procedural dictates of this Michigan statute necessarily equates to a *federal* due process violation. In fact, while state law may create a property interest that is eligible for federal Fourteenth Amendment protection, federal law alone determines "what process is due" in order to comply with the dictates of the U.S. Constitution. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 541, 105 S. Ct. 1487, 1493 (1985) (internal quotation marks

_____

[24]In the Court's view, this provision cannot be read as mandating a majority vote prior to each and every sale of association property. Rather, the "majority vote" referred to in the statute seemingly is necessary to enact a "general by-law," which in turn confers upon the trustees the broader authority to make such property sales "upon such terms and subject to such reservations and restrictions as may be deemed advisable." Mich. Comp. Laws § 455.205.

Thus, the pertinent question here would be whether the CPA's by-laws grant such authority. Although there is no by-law that explicitly confers the authority to sell association property, the by-laws generally: (i) state that one of the purposes of the association is to "buy, improve, sell, convey, mortgage, and lease lands," (Township's Motion, Ex. 1-E, Bylaws art. II, § 4); (ii) provide that the association "shall be governed by a Board of Trustees," (id., art. VI, § 13); and (iii) impose duties upon the association's officers, who in turn are elected by the board, to "promote the general welfare of the owners," provide for "the maintenance of the bridges, roads, water supply, fire protection, and all necessary requirements for the general welfare of the owners," and to take the necessary steps to perform these duties "as directed by the Board of Trustees," (id., art. VII, § 26). Viewed collectively, these by-laws seemingly authorize the CPA board to sell land as appropriate to promote the general welfare of the association's members. If so, it might well be argued that the sale of the Colony Tower promoted the general welfare of the property owners, as the Tower had fallen into disrepair and the CPA lacked the means to rehabilitate it. Certainly, based on the results of the CPA's survey, the majority of property owners evidently agreed that the sale of the Tower served the community's best interests.

28

and citation omitted).  Thus, even if the CPA failed to comply with one of the procedural requirements of Michigan's Summer Resort Owners Act before selling the Colony Tower to the Township, this would not suffice to establish that the CPA committed a federal due process violation.

Rather, the "root requirement" of the federal guarantee of due process is that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case."  Loudermill, 470 U.S. at 542, 105 S. Ct. at 1493 (internal quotations marks and citations omitted).  Here, the Township board voted to approve the purchase of the Tower on October 7, 2002, after the Township's Zoning Board of Appeals had approved the corresponding lot split on September 26, 2002.  Both of these decisions were reached at public meetings, with an opportunity for anyone in attendance to express his or her views.  Indeed, Plaintiffs acknowledge in their complaint that they received notice of the proceedings before the Zoning Board of Appeals.  (See Complaint at ¶ 119.)

Moreover, prior to these Township meetings and votes, the Colony Park property owners were given ample and repeated notice that the CPA board was considering a possible sale of the Tower to the Township.  Most notably, the CPA board conducted a May 27, 2002 survey of property owners to elicit their views on a number of options regarding the disposition of the Tower.  In a letter accompanying this survey, CPA president Paul Johnson provided considerable background information regarding (i) various engineering studies of the estimated cost of restoring the Tower, and (ii) the past

29

efforts to raise funds for restoration and the prospects for securing additional funding. Johnson further observed that the Tower had been a subject of discussion at the CPA annual meeting on November 3, 2001, and that property owners had been contacted by phone to urge them to attend a May 20, 2002 Township meeting at which the sale of the Tower was discussed.[25]

Johnson then sent a follow-up letter to property owners on July 20, 2002, advising them of the results of the survey. As noted earlier, this survey revealed that 78 property owners were in favor of the Tower sale — including nine of the named Plaintiffs in this action — with only 8 owners expressing their opposition to this course of action. Thus, Johnson informed the owners that he and two other CPA officers had been authorized by the board to conduct negotiations with the Township for the sale of the Tower, and he noted the conditions —including the necessity of a lot split and the purposes for this split — under which the board had agreed to sell the Tower. This record, considered in its totality, satisfies the Court that the dictates of due process were met here. Certainly, Plaintiffs have not identified any authority for the proposition that more was required under the circumstances.

In any event, Plaintiffs would not be entitled to proceed with their federal due process claim so long as state remedies remain available that they have not yet pursued.

_____

[25]Notably, Johnson opined in this letter that the CPA board was authorized under the association's by-laws to determine whether to sell the Tower, and that the survey of property owners on this matter was entirely advisory and would not be binding upon the board.

See Wilson v. Beebe, 770 F.2d 578, 583-84 (6th Cir. 1985); Wax 'N Works v. City of St. Paul, 213 F.3d 1016, 1019-20 (8th Cir. 2000); New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474, 1480 (7th Cir. 1990).  As to the decision of the Township's Zoning Board of Appeals, at least, the Michigan courts are available for review of such determinations.  See Mich. Comp. Laws § 125.293a(1).  More generally, the Township's actions are subject to judicial review, with the exception, of course, of those actions shielded by governmental immunity.  See Ballard v. Ypsilanti Township, 457 Mich. 564, 577 N.W.2d 890, 893 (1998).  At a minimum, Plaintiffs have failed to establish to the Court's satisfaction that no state processes are available for challenging the sale of the Colony Tower.

Finally, while it is unclear, once again, whether Plaintiffs also mean to pursue a substantive due process claim, any such claim would lack support in the evidentiary record.  Simply stated, Plaintiffs have produced no evidence that Defendants acted arbitrarily, irrationally, or in a manner that might shock the conscience, nor have they shown, or even suggested, that Defendants were motivated by an improper retaliatory or partisan political purpose.  See Lewellen v. Metropolitan Gov't of Nashville & Davidson County, 34 F.3d 345, 348-51 (6th Cir. 1994); New Burnham Prairie Homes, 910 F.2d at 1480-81.  Indeed, from the record presented in this case, the Court could only conclude that Defendants acted wholly appropriately, developing and then implementing a plan that resulted in the successful rehabilitation of the Colony Tower and its preservation as a historic landmark, all without any assessments being imposed upon the Colony Park

31

property owners.  While Plaintiffs might not share this view, and might instead question the wisdom of and authority for Defendants' decisions in connection with the sale of the Colony Tower, such allegations, even if proven, would fall far short of establishing the abuse of power needed to sustain a substantive due process claim.[26]

**D.      Defendants' Motions for Rule 11 Sanctions**

Having determined that Defendants are entitled to summary judgment in their favor on all of Plaintiffs' claims, the Court next turns to Defendants' motions for sanctions under Fed. R. Civ. P. 11.  As should be evident from the foregoing discussion, the Court readily agrees that Plaintiffs' submissions in this case fall well short of the standards set forth in Rule 11.  Nonetheless, the Court finds that only the Township, and not the CPA, is entitled to an award of sanctions under Rule 11, because the CPA failed to comply with the Rule's "safe harbor" provision.

Under Rule 11, an attorney's signature on a written submission to the Court constitutes a certification "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that (i) the claims and other legal contentions are "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law," and

---

[26]Similarly, to the extent that Plaintiffs mean to assert claims beyond those addressed to this point in this Opinion, the Court agrees with Defendants that there is no evidentiary support for any such claims.  Defendants point, for example, to Plaintiffs' apparent allegation that certain lots in the Colony Park subdivision were improperly transferred to the CPA treasurer. Regardless of whether this allegation is meant to support a separate claim, Defendants correctly observe that there is not a shred of evidence to support this allegation of a property transfer.

(ii) the "allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). Beyond these specific standards, the general "test for the imposition of Rule 11 sanctions [is] . . . whether the individual's conduct was reasonable under the circumstances." Union Planters Bank v. L & J Development Co., 115 F.3d 378, 384 (6th Cir. 1997) (internal quotation marks and citations omitted).

The Sixth Circuit has emphasized that the Rule's requirement of reasonableness "is not a one-time obligation." Runfola & Associates, Inc. v. Spectrum Reporting II, Inc., 88 F.3d 368, 374 (6th Cir. 1996) (internal quotation marks and citation omitted). Rather, each party "is impressed with a continuing responsibility to review and reevaluate his pleadings and where appropriate modify them to conform to Rule 11." Runfola, 88 F.3d at 374 (internal quotation marks and citation omitted). In particular, "after discovery has been launched, if plaintiffs are still unable to plead a sufficient factual basis for the allegations made against defendants, the spectre of Rule 11 sanctions should guide the actions of plaintiffs' counsel." 88 F.3d at 374 (internal quotation marks and citation omitted). Thus, even if a plaintiff and its counsel have conducted a reasonable pre-filing inquiry, and even if the plaintiff's claims survive an initial motion to dismiss, Rule 11 sanctions may properly be based upon the plaintiff's subsequent "failure to dismiss the case after becoming aware that it lacked merit." Runfola, 88 F.3d at 374; see also Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendments (observing that the 1993

33

amendments were intended to "emphasize[] the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable").

In this case, the Court finds that Plaintiffs' allegations and legal positions were not reasonable at the inception of this litigation, and that they became even less so as the parties — or, to be accurate, Defendants — investigated the grounds for these allegations and contentions. It is important to note, as an initial matter, that most of Plaintiffs' allegations in their complaint derive from materials in the public record, such as decisions reached at public meetings and statements contained in correspondence sent to Plaintiffs and other Colony Park property owners. Where, as here, much of the factual record is known, or at least readily available, at the time the complaint is filed, it is reasonable to expect that Plaintiffs and their counsel should have been able to make a sound appraisal of the viability of their claims. In addition, it is reasonable to expect that Plaintiffs and their counsel would have omitted any allegations that were contrary to the public record.

Yet, Plaintiffs and their counsel failed to take either of these reasonable steps before filing the complaint in this case. It should have been evident to Plaintiffs and their counsel, for example, that their allegations and claims regarding events that occurred and decisions that were made back in the mid 1990s were likely to confront serious statute of limitations obstacles, and that none of the usual tolling devices, such as the continuing violation doctrine or the recent discovery of previously unknown facts, would be available under the circumstances. In addition, at least some of the Plaintiffs surely were aware, and their counsel likewise knew or should have known, that certain of their claims

34

had already been litigated and decided against them in the course of prior state court proceedings, so that they would be precluded from relitigating any such matters here. Nonetheless, this knowledge seemingly was not brought to bear in the preparation and filing of the complaint.

And, if certain of Plaintiffs' claims were legally unsound, some of their allegations were likewise untenable in light of the known or readily available public record. As an example, Plaintiffs alleged in their complaint that the Township somehow acquired ownership of the Colony Park water system, without any reasonable prospect of establishing a factual predicate for this claim. Similarly, they alleged that the certain parcels of property were unlawfully transferred to the CPA's treasurer, despite the absence of any public record of such a transfer, and despite the fact that such a transfer could only have been carried out through duly recorded public documents. More generally, Plaintiffs posited back-room conspiracies and deliberate attempts to mislead, when the records of public meetings and of the CPA's correspondence with its membership ran directly counter to these allegations of nefarious doings.

Still, this unreasonable conduct at the inception of this case could have been mitigated, at least, if Plaintiffs and their counsel had responded to Defendants' summary judgment motions by acknowledging that their claims could not be sustained. At that point, Defendants had assembled a record that belied many of the allegations of Plaintiffs' complaint, and had thoroughly identified the many legal defects in Plaintiffs' various theories of recovery. Yet, Plaintiffs and their counsel continued to oppose the dismissal

35

of their claims, through responses that were often unintelligible, were wholly unsupported

by any evidence — and, in fact, were frequently contradicted in the record presented by

Defendants — and lacked any citation whatsoever to supporting legal authority.[27]  This

alone would warrant Rule 11 sanctions, but all the more so in light of the unreasonable

conduct of Plaintiffs and their counsel as reflected in the initial complaint.

Predictably, when confronted with this record of unreasonable conduct as

presented in Defendants' well-grounded motions for sanctions, Plaintiffs have filed a

near-verbatim copy of their earlier submissions in response to Defendants' summary

judgment motions, with a page or two tacked onto the end in which they purport to show

that they have not run afoul of Rule 11.  Plaintiffs state, for example, that they have

pursued this litigation in "good faith," and out of a "sincere" belief that their rights have

been violated.  Yet, as Defendants point out, a showing of "good faith" is not "sufficient

to avoid sanctions," INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc., 815

F.2d 391, 401 (6th Cir. 1987), nor is it necessary to prove subjective bad faith in order to

warrant such an award, see Herron v. Jupiter Transportation Co., 858 F.2d 332, 334-35

(6th Cir. 1988).  Moreover, the sincerity of Plaintiffs' beliefs surely can be questioned

when some of them, at least, are flatly refuted by the documentary record.

Plaintiffs and their counsel next assert, in a conclusory fashion and without any

supporting detail, that their claims might yet prove meritorious upon further investigation

---

[27]What is more, these responses often were not timely filed in accordance with the local rules of this District.

through the discovery process. Plaintiffs advanced this contention, however, at a point
several months after the filing of their complaint, during which they were free to engage
in discovery, and just a few weeks before the discovery cut-off date as set forth in the
Court's scheduling order. In addition, Defendants state without contradiction that
Plaintiffs and their counsel made ***no effort*** to conduct any discovery in this action. It also
is worth noting that Plaintiffs never suggested in their responses to Defendants' summary
judgment motions that additional discovery was needed in order to properly oppose these
motions. See Fed. R. Civ. P. 56(f); see also Ball v. Union Carbide Corp., 385 F.3d 713,
719-21 (6th Cir. 2004). Finally, even assuming that further discovery might have proved
helpful to at least some of Plaintiffs' claims, and even assuming that the fault for this did
not lie squarely with Plaintiffs and their counsel, this would do nothing to diminish the
Court's conclusion that certain aspects of Plaintiffs' initial complaint, at least, would not
have passed muster under any sort of reasonable pre-filing investigation.

Consequently, the Court finds that the conduct of Plaintiffs and their counsel did
not measure up to the objective standards of Rule 11, whether at the time the complaint
was filed or upon the filing of Defendants' summary judgment motions. Certain of
Plaintiffs' allegations had no prospect of gaining support through discovery, and most or
all of their claims suffered from fundamental legal defects that should have been evident
from the outset of this case, or at the very least by the time that Defendants identified
these defects in their dispositive motions. The combination here of frivolous claims and
persistent unreasonableness in the face of well-grounded argument clearly warrants the

imposition of Rule 11 sanctions.

Unfortunately, Defendant CPA failed to satisfy one of the procedural prerequisites for such an award. Under the so-called "safe harbor" provision of Rule 11, a party "shall not" file a motion for sanctions with the Court "unless, within 21 days afer service of the motion" upon the opposing party, "the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(1)(A). As the Sixth Circuit has observed, this provision mandates a "two-step process" for seeking sanctions: "first, serve the Rule 11 on the opposing party for a designated period (at least twenty-one days); and then file the motion with the court." Ridder v. City of Springfield, 109 F.3d 288, 294 (6th Cir. 1997). The Court further explained:

> Thus, the 1993 amendments [to Rule 11] allow for a twenty-one day period of "safe harbor," whereby the offending party can avoid sanctions altogether by withdrawing or correcting the challenged document or position after receiving notice of the allegedly violative conduct. In that way, the "safe harbor" provision works in conjunction with the duty of candor, giving the proponent of a questionable claim an opportunity to assess the claim's validity without immediate repercussion.

Ridder, 109 F.3d at 294.

Here, while the Township complied with this "safe harbor" provision,[28] the CPA did not. Rather, as stated in the brief in support of the CPA's motion, "Defendant CPA served Plaintiffs' counsel with this Motion for Sanctions and supporting Brief" on August

---

[28]The record discloses that the Township served its Rule 11 motion on May 6, 2004, and then filed the motion with the Court on May 28, 2004.

38

26, 2004.  (Defendant CPA's Motion for Sanctions, Br. in Support at 2.)[29]  The CPA then

filed this Rule 11 motion just ***four days later,*** on August 30, 2004.  As a result, Plaintiffs

were not given the full 21-day "safe harbor" period in which to decide whether to

withdraw any of the challenged claims, allegations, or legal contentions.

To be sure, the CPA's counsel previously had sent a letter to Plaintiffs' attorneys

alerting them to a forthcoming motion for sanctions.  This July 22, 2004 letter identified

the grounds to be advanced in the CPA's forthcoming summary judgment motion, and

then stated:

> In addition, we will also be filing a Motion for Sanctions under Rule
> 11 of the Federal Rules of Civil Procedure.  As I will be serving that Motion
> for Sanctions and Motion for Summary Disposition upon you in the next
> couple of days, you have the period of time set forth in the Federal Court
> Rules to determine whether or not you are willing to voluntarily dismiss the
> case against the CPA to avoid sanctions.

(Defendant CPA's Motion for Sanctions, Ex. A, 7/22/2004 Letter to Plaintiffs' Counsel.)

Yet, so far as the record reveals, the motion for sanctions was not served "in the next

couple of days," but only on August 26 or 27, 2004, three or four days before it was filed

with the Court.

Binding Sixth Circuit precedent — as well as the plain language of Rule 11 itself

— demonstrates that the July 22 warning letter from the CPA's counsel was not an

adequate substitute for service of the CPA's actual motion.  As stated in <u>Ridder</u>, <u>supra</u>:

---

[29]The Court notes a minor discrepancy between this assertion and the proof of service
that accompanied the CPA's motion.  In particular, the proof of service indicates that the motion
was served on August 27, not August 26.

Rule 11 cases emerging in the wake of the 1993 amendments have found the "safe harbor" provision to be an absolute requirement. We agree that the rule is unquestionably explicit with respect to this issue. The plain language of Rule 11 specifies that unless a movant has complied with the twenty-one day "safe harbor" service, the motion for sanctions "shall not be filed with or presented to the court." Fed. R. Civ. P. 11(c)(1)(A). [The defendant] did not comply with the "safe harbor" procedural prerequisite; therefore, [its] Rule 11 motion should not have been presented to the court.

Ridder, 109 F.3d at 296 (citations omitted).

Thus, in "adher[ence] to the rule's explicit language and overall structure," the Sixth Circuit held that "sanctions under Rule 11 are unavailable unless the motion for sanctions is served on the opposing party for the full twenty-one day 'safe harbor' period before it is filed with or presented to the court." 109 F.3d at 297; see also Brickwood Contractors, Inc. v. Datanet Engineering, Inc., 369 F.3d 385, 389 (4th Cir. 2004); Gordon v. Unifund CCR Partners, 345 F.3d 1028, 1030 (8th Cir. 2003). But see Nisenbaum v. Milwaukee County, 333 F.3d 804, 808 (7th Cir. 2003) (holding that a party "complied substantially" with the "safe harbor" provision by sending its opposing counsel "a 'letter' or 'demand' rather than a 'motion'").[30] It follows that the Court may not award Rule 11

---

[30]The Court recognizes that the Sixth Circuit has suggested, albeit in an unpublished decision, that "warning letters" might suffice to comply with Rule 11's "safe harbor" provision. See Barker v. Bank One, Lexington, N.A., 156 F.3d 1228, 1998 WL 466437, at *2 (6th Cir. July 30, 1998). This statement seemingly is dicta, however, as the Court further observed that the motion for sanctions in that case had, in fact, been served on the opposing party "21 days before filing it with the court." Barker, 1998 WL 466437, at *2. Moreover, this Court necessarily is bound to follow the Sixth Circuit's prior, published decision in Ridder, which seemingly admits of no "substantial compliance" exception to the plain language of Rule 11. Finally, this Court shares the view of Judge Feikens that "the *Barker* case is wrongly decided," where the plain language of the "safe harbor" provision requires service of the motion at least 21 days before filing with the court, and where the Advisory Committee notes to the Rule indicate that warning letters are supplemental to, and not a substitute for, the service of the Rule 11 motion itself. See

sanctions to the CPA in this case, where its motion for sanctions was not served upon Plaintiffs' counsel at least 21 days before it was filed with the Court.

Finally, the Court must determine the nature of the sanctions to be awarded to the Township, and whether these sanctions should be imposed only upon Plaintiffs' counsel or also upon Plaintiffs themselves. As to the first of these issues, the Court finds that the Township should be awarded the entirety of its reasonable attorneys' fees and other expenses incurred in defending against the claims asserted in this case. See Fed. R. Civ. P. 11(c)(2) (expressly authorizing such an award if "warranted for effective deterrence"). Given the existence of Rule 11 violations from the inception of this case, and given the Township's prompt summary judgment motion and request for sanctions within a few months after the case was filed, the Court believes that such an award properly reflects the harm inflicted and resources needlessly diverted as a result of the unreasonable conduct of Plaintiffs and their counsel. In addition, the Court finds that a lesser award would not adequately "deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(2).

Finally, the Court finds that most, but not all, of this award should be paid by Plaintiffs' counsel, as opposed to Plaintiffs themselves. To the extent that the Court has found that Plaintiffs' claims were not well-grounded in law and that their legal contentions lacked merit, Rule 11 dictates that any resulting monetary sanctions must be

---

McKenzie v. Berggren, 212 F.R.D. 512, 514 (E.D. Mich. 2003).

imposed upon the attorney rather than the client.  <u>See</u> Fed. R. Civ. P. 11(c)(2)(A).  In addition, Plaintiffs' counsel must bear the principal responsibility for the woefully inadequate responses to Defendants' various motions.  The Court further believes that Plaintiffs' counsel owed an obligation to his clients to advise them that their claims could not withstand summary judgment, and that it would not be appropriate to incur the additional expense of opposing Defendants' motions.  Accordingly, Plaintiffs' counsel is properly chargeable, at a minimum, for having unduly prolonged this litigation.

Yet, the Court cannot say that Plaintiffs themselves played an insignificant role in the violations that occurred here.  Most importantly, it is evident that many of Plaintiffs' complaints with Defendants substantially pre-date this litigation, spanning back to the mid 1990s.  Indeed, some of the Plaintiffs previously have been involved in legal proceedings with Defendant CPA concerning their obligation to pay various assessments.  Despite the adverse state court rulings on these matters, they continued to challenge these assessments in this case.  This strongly indicates, in the Court's view, that Plaintiffs themselves were active participants in the decisionmaking process that led to the assertion of frivolous claims in this case, as they apparently were unwilling to accept the considered judgments of prior courts that their complaints about the CPA's alleged abuses of authority were unfounded.

In addition, Plaintiffs and their counsel alike must be charged with the knowledge that certain of the complaint's allegations were either false or, at a minimum, were unlikely to garner any evidentiary support in discovery.  A simple perusal of the public

record would have revealed to Plaintiffs that the conspiracy theories advanced in their complaint had no basis in fact. While Plaintiffs' counsel should have ensured that no such allegations made their way into papers filed with the Court, Plaintiffs themselves surely were the source of most of these unfounded factual assertions. Accordingly, the Court finds that Plaintiffs must pay 25 percent of the sanction award imposed by the Court, with Plaintiffs' counsel paying the remaining 75 percent. The precise amounts of these sanctions will be determined by the Court following its review of the submissions ordered below.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Clay Township's May 6, 2004 Motion for Summary Judgment is GRANTED. IT IS FURTHER ORDERED that Defendant Colony Park Association's August 30, 2004 Motion for Summary Judgment also is GRANTED. However, IT IS FURTHER ORDERED that Defendant Colony Park Association's September 1, 2004 Motion for Entry of Default Judgment is DENIED, and that the CPA's counterclaims in this case be DISMISSED WITHOUT PREJUDICE.

Next, IT IS FURTHER ORDERED that Defendant Clay Township's May 28, 2004 Motion for Rule 11 Sanctions is GRANTED, but that Defendant Colony Park Association's August 30, 2004 Motion for Rule 11 Sanctions is DENIED. In light of these rulings, IT IS FURTHER ORDERED that, within ***fourteen (14) days*** of the date of

43

this Opinion and Order, Defendant Clay Township shall file and serve a statement and supporting materials setting forth the precise amounts of attorneys' fees and expenses claimed to be awardable in accordance with the Court's rulings.  Upon service of this statement, Plaintiffs shall then have ***fourteen (14) days*** in which to file and serve any objections to the award sought by the Township.  The Township shall then, if it wishes, file and serve within ***seven (7) days*** a submission in further justification of the award sought in its initial statement.  Upon reviewing these submissions, the Court will enter an order determining an appropriate monetary sanction under the circumstances.

Finally, in light of the Court's rulings, Plaintiffs' August 18, 2004 Motion for Preliminary Injunction is DENIED AS MOOT.

SO ORDERED.


                                        s/Gerald E. Rosen
                                        Gerald E. Rosen
                                        United States District Judge

Dated:  September 27, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 27, 2005, by electronic and/or ordinary mail.

                                        s/LaShawn R. Saulsberry
                                        Case Manager